## W. A. WURZBACH v. P. GUSTAV MENGER.

### Decided November 27, 1901.

1.—Homestead—City Lots—Use—Segregation by Renting.

Where lots originally a part of the city homestead were fenced off and houses built thereon which were rented to tenants by the month for several years, they were thereby segregated from the homestead and subject to execution, although the owner sometimes hung out clothes to dry on parts of them, and had the right to carry water across one of them, and his children and chickens had free access to all the lots.

2.—Same—Rent Necessary for Support of Family.

The fact that the money received for the rent of such lots was necessary for the support of the owner's family could not shield them from forced sale for his debts.

3.—Same—Homestead Use—Barn.

Where a portion of one of the lots fenced off and rented was occupied by the owner's barn, such portion remained a part of the homestead.

4.—Some—Evidence Showing Segregation.

The fact that the owner had been renting the houses for ten years, and that the rent money was necessary for the support of his family, was conclusive that the lots had been permanently set apart as tenant houses.

Appeal from Bexar. Tried below before Hon. John H. Clark.

*W. A. Wurzbach* and *M. W. Davis,* for appellant.

*T. F. Shields,* for appellee.

FLY, ASSOCIATE JUSTICE.—This is an action of trespass to try title instituted by appellant, which resulted, in a trial by jury, in a verdict and judgment for appellee.

Appellant claims the land through a sheriff's deed. The three lots are situated in the city of San Antonio, and appellee claims they are a part of his homestead. The plat of the premises introduced in evidence by appellee is as follows:

Appellee resides on lot C, and there is no contest as to any of the land except the lots designated A, B, and G. The uncontroverted proof is to the effect that some years ago appellee built houses on lots A, B, and G, and separated the lots by fences from the other parts of the land. Since

the houses were erected they have been rented whenever tenants could be obtained. We quote from appellee's testimony: "I use the house on lot G, as shown by the map, for the purpose of renting, and it is rented. I have reserved the right to carry water from my cistern through that gate down to the lot where I water my cows and horses. I have been in the butcher business. I had no other means for providing for my family, and put up the houses on B and A for renting, and used this money for supplying my family. We let our chickens run all through there to D between the houses. The sheds are very small. We have reserved the right to hang up our clothes there in either of those lots, and our children play over there just as well as at home. My wife hangs up clothing on these other lots at any time she wishes. I am not engaged in any business now. I have not been engaged in business since 1890. The renting of my houses was temporary, for the purpose of supporting my family. * * * If the renters on lots A and B were washing the same day we washed, we couldn't hang up our clothes there. When we had no room on lots A and B to hang the clothes, we hung them on lot D, as shown by said map. * * * We built the house on lot B, as shown by said map, in 1890. * * * I built the house on lot A, as shown by said map, at the same time I built the house on lot B. I built the house upon lot A first, then I built the one upon B, and when the house upon B was finished, I built the one upon lot G, as shown by said map. All the rent cottages were built in same manner. I meant when I told the jury that I built the houses for temporary use, that I can provide for my family in no other way. * * * They have been occupied from month to month since I built them, and I used the money for the support of my family. The purpose in building and renting these houses was so that I could have a support for my family. I have been relying on the receipt of rents from these houses for support since I built them."

Mrs. Menger, the wife of appellee, testified as follows: "My name is Ida Menger. I am the wife of Peter G. Menger. I am now living at the corner of Hackberry and Sherman streets, where I have been living since 1888. I have been living at that same place eleven years. I know how the property is divided as to fences, and the map offered by defendant is a correct description and location of the property. There are three tenant houses, one on lot A, one on lot B, and one on lot G, as shown by said map. I rent these places for the support of my family, and then the children play in both of these grounds, and sometimes I hang up my clothing to dry in this yard, and back there on lot E is a cow lot, and on lot D is the barn. I go through the gate between lots C and D to get to the cow lot, and I go between C and G to get water from the cistern. There is a fence on Hackberry street, and between the two houses there is a gate. There is a gate between the two fences and one that goes into the horse lot. Lots E and F are an open place all the time for the horses and cows back there. We have several times plowed lot H as shown by said map and planted cane on it, and the

cane is used for the horses and cows. We have two horses. On lot D near the barn there is a closet, and barn and cedar posts in the back end which we used when we kept hogs a year or two ago, and there are several sheds in the back upon lots E and F for the cow and horses to get under when it rains. In renting these houses that I speak of the renting was temporary. We rented them by the month, sometimes by the week, just as it happened. I have no other homestead besides that place. I mean by temporary renting of the cottages that we rented them from month to month, and not for a year or two years. We have rented them from month to month to tenants. It is not my purpose to continue renting these houses; if I had any other way of taking care of my family I would not rent these houses. A space marked E on said map is for the horses and cows back of the barn. There is so much shade there the clothes won't dry, and there is not room enough on my side. Here there is generally children running about, and so I would put them over in that lot. When there were no small children running about I would put the clothes in the front lot. I made an agreement with the tenant to use their yards for hanging my clothes, but do not remember when this agreement was made."

We conclude that the testimony of appellee established that the lots, with the exception of the parts hereinafter mentioned, were completely segregated from the homestead and put to other than homestead purposes. The fact that clothes were sometimes strung up on lots A and B, and that appellee had the right to carry water across lot G, and that the children and the chickens had free access to all the lots, did not have the effect of retaining the lots for homestead purposes.

The testimony indicated that a portion of lot G was occupied by one side of the barn, and so much thereof as is occupied by it would remain a part of the homestead.

It is insisted that the renting was temporary, but the evidence does not show it. Because appellee could at any time remove the houses or discontinue renting them is no evidence that he would ever do it, and the fact that he has been renting the houses for ten years or more, and that the rent money is necessary for the support of his family, is conclusive that the lots have been permanently set apart as tenant houses. Wynne v. Hudson, 66 Texas, 1; Blackburn v. Knight, 81 Texas, 326.

Appellee reiterated that the money received from the rent houses was necessary for the support of his family, but, while this might evoke sympathy for his unfortunate position, it could not shield the property from being sold for his debts. Oppenheimer v. Fritter, 79 Texas, 99.

Because the verdict of the jury was contrary to the evidence, the judgment is reversed and the cause remanded.

*Reversed and remanded.*